**In re NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION.**

**Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated, Plaintiffs,**

**v.**

**National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc., Defendants.**

**This Document Relates to: All Actions.**

**No. 2:12–md–02323–AB.**
**MDL No. 2323.**
**Civ. Action No. 14–00029–AB.**

United States District Court, E.D. Pennsylvania.

Signed July 7, 2014.

Perry Golkin, New York, NY, for National Football League Players' Concussion Injury Litigation.

## *MEMORANDUM*

ANITA B. BRODY, District Judge.

Plaintiffs Kevin Turner and Shawn Wooden, through their proposed Co–Lead Class Counsel, Class Counsel, and Subclass Counsel, and Defendants National Football League and NFL Properties, LLC (collectively, the "NFL Parties")[1] have negotiated and agreed to a Class Action Settlement ("Settlement") that will resolve all claims against the NFL Parties in this multidistrict litigation.[2] On June 25, 2014, Plaintiffs filed an unopposed motion for an order: (1) granting preliminary approval of the proposed Class Action Settlement Agreement; (2) con-

---

1. Plaintiffs have also sued Riddell, Inc., Riddell Sports Group Inc., All American Sports Corporation, Easton–Bell Sports, Inc., EB Sports Corp., Easton–Bell Sports, LLC, and RBG Holdings Corp. (collectively, the "Riddell Defendants"). The Riddell Defendants are not a party to the proposed Settlement.

2. Capitalized terms used in this Memorandum have the same meaning as those in the June 25, 2014 Class Action Settlement Agreement. Pl.'s Mot. Ex. B, June 25, 2014, ECF No. 6037.

ditionally certifying a Settlement Class and Subclasses; (3) appointing Co–Lead Class Counsel, Class Counsel, and Subclass Counsel; (4) approving the dissemination of class notice; (5) scheduling a Fairness Hearing; and (6) staying matters as to the Released Parties and enjoining proposed Settlement Class Members from pursuing Related Lawsuits. For the following reasons, I will grant the motion.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In July 2011, the first retired players filed lawsuits against the NFL Parties alleging, *inter alia,* that the NFL Parties breached their duties to the players by failing to take reasonable actions to protect players from the chronic risks created by concussive and sub-concussive head injuries and that the NFL Parties concealed those risks from the players. Since that time, more than 5,000 former players have filed substantially similar lawsuits. These lawsuits have been consolidated before me as a multidistrict litigation ("MDL"), pursuant to 28 U.S.C. § 1407. *See* MDL Panel Transfer Order, Jan. 31, 2012, ECF No. 1.

On July 8, 2013, I directed the parties to mediation before retired U.S. District Court Judge Layn Phillips. Order, July 8, 2013, ECF No. 5128. On August 29, 2013, Judge Phillips informed me that Plaintiffs and the NFL Parties had signed a term sheet incorporating the principal terms of a settlement. Order, Aug. 29, 2013, ECF No. 5235. On December 16, 2013, pursuant to Federal Rule of Civil Procedure 53, I appointed Perry Golkin as Special Master to assist me in analyzing the financial aspects of any settlement. Order Appointing Special Master, Dec. 16, 2013, ECF No. 5607.

On January 6, 2014, Plaintiffs moved for entry of an order preliminarily approving their proposed settlement and conditionally granting class certification. Pl.'s Mot., Jan.

6, 2014, ECF No. 5634. At the same time, Plaintiffs filed their Class Action Complaint. Class Action Compl., *Turner v. Nat'l Football League,* No. 14–00029 (E.D.Pa. Jan. 6, 2014), ECF No. 1. On January 14, 2014, I denied the motion without prejudice, expressing concern as to the adequacy of the proposed $675 million Monetary Award Fund in light of the 65–year lifespan of the Monetary Award Fund, the settlement class size of more than 20,000 members, and the potential magnitude of the awards. Order, Jan. 14, 2014, ECF No. 5658.

After six months of additional negotiation, guided by my January 14, 2014 opinion and Special Master Golkin, the parties reached a revised Settlement aimed at providing assurance that all Retired NFL Football Players who ultimately receive a Qualifying Diagnosis or their related claimants will be paid. Special Master Golkin has been a critical source of advice and financial expertise for the parties and me.[3] As a result of the negotiations, the Monetary Award Fund is no longer fixed at $675 million, and the NFL Parties must pay all valid claims for the next 65 years. The revised Settlement retains the same significant Monetary Award levels and the NFL Parties' obligation to pay for the costs and expenses of claims administration. It also includes new measures designed to prevent fraudulent claims.

## II. THE PROPOSED CLASS ACTION SETTLEMENT

### A. The Proposed Settlement Class

The Settlement provides for a nationwide Settlement Class consisting of three types of claimants: (1) Retired NFL Football Players, generally defined as all living NFL football players who, prior to the date of the Preliminary Approval and Class Certification Order,[4] retired, formally or informally, from playing professional football with the NFL or any Member Club, including American Foot-

---

**3.** I am grateful to Special Master Golkin for his time and effort.

**4.** "Preliminary Approval and Class Certification Order" is defined in the June 25, 2014 Class Action Settlement Agreement as the Court's order preliminarily approving the Class Action Set-

tlement and conditionally certifying the Settlement Class and Subclasses. *See* Pl.'s Mot. Ex. B, June 25, 2014, ECF No. 6037. For the avoidance of any ambiguity, the order accompanying this Memorandum is the "Preliminary Approval and Class Certification Order."

ball League, World League of American Football, NFL Europe League, and NFL Europa League players; (2) authorized representatives, ordered by a court or other official of competent jurisdiction, of deceased or legally incapacitated or incompetent Retired NFL Football Players ("Representative Claimants"); and (3) close family members of Retired NFL Football Players or any other persons who properly assert, under applicable state law, the right to sue by virtue of their relationship with a Retired NFL Football Player ("Derivative Claimants"). Based on the records of the NFL Parties, there are more than 20,000 Settlement Class Members. Pl.'s Mem. Law 33, June 25, 2014, ECF No. 6073.

The Settlement Class consists of two Subclasses: Subclass 1 is defined as Retired NFL Football Players who were not diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order, and their Representative Claimants and Derivative Claimants; and Subclass 2 is defined as Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants, and the Representative Claimants of deceased Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to death or who died prior to the date of the Preliminary Approval and Class Certification Order and who received a post-mortem diagnosis of chronic traumatic encephalopathy ("CTE"). A Qualifying Diagnosis is defined as Level 1.5 Neurocognitive Impairment (early Dementia), Level 2 Neurocognitive Impairment (moderate Dementia), Alzheimer's Disease, Parkinson's Disease, Amyotropic Lateral Sclerosis ("ALS"), and/or Death with CTE.

### B. The Proposed Settlement

The current Settlement provides that the NFL Parties will make payments over a period of years to create three sources of benefits for Settlement Class Members.

First, the Settlement provides for a $75 million Baseline Assessment Program ("BAP") that will offer all eligible Retired NFL Football Players baseline neuropsychological and neurological evaluations to determine the existence and extent of any cognitive deficits. In the event that retired players are found to suffer from Level 1 Neurocognitive Impairment (moderate cognitive impairment), they may receive certain BAP Supplemental Benefits in the form of specified medical treatment and/or evaluation, including counseling and pharmaceutical coverage. In addition to detecting any cognitive impairment, the results of BAP examinations may be used as a comparison against any future tests to determine whether a Retired NFL Football Player's cognitive abilities have deteriorated. Further, subject to the reasonable informed consent of Retired NFL Football Players, in compliance with applicable privacy and health laws, and any other customary authorization, medical data generated will be made available for use by those conducting medical research on cognitive impairment, safety, and injury prevention.

Second, the Settlement provides for a 65–year Monetary Award Fund that will award cash to Retired NFL Football Players who already have a Qualifying Diagnosis or receive one in the future. Representative Claimants and Derivative Claimants related to such players will also be eligible for cash awards. The Qualifying Diagnoses and their maximum Monetary Award levels are as follows: Level 1.5 Neurocognitive Impairment ($1.5 million); Level 2 Neurocognitive Impairment ($3 million); Alzheimer's Disease ($3.5 million); Parkinson's Disease ($3.5 million); ALS ($5 million); Death with CTE ($4 million).[5] These awards may be reduced based on a retired player's age at the time of diagnosis, the number of NFL seasons played, and other applicable offsets outlined in the Settlement. If, after receiving an initial Monetary Award, a Retired NFL Football Player becomes eligible for a larger Award because of a different Qualifying Diagnosis, the retired player will be provided

---

5. Beginning one year after the Effective Date of the Settlement, all Monetary Awards will be adjusted upwards by as much as 2.5% per year for inflation.

with a Supplemental Monetary Award to ensure that the retired player receives the maximum award to which he is entitled. The Settlement does not require Settlement Class Members to prove that the Retired NFL Football Player's cognitive injuries were caused by NFL-related concussions or sub-concussive head injuries. Both Settlement Class Members and the NFL Parties have the right to appeal a Class Member's entitlement to a Monetary Award.

Third, the Settlement establishes a $10 million Education Fund to fund education programs promoting safety and injury prevention with regard to football players, including safety-related initiatives in youth football. This Fund will also educate Retired NFL Football Players regarding the NFL's medical and disability programs.

A Special Master will oversee the functions of a Claims Administrator who will process claims for Monetary Awards and Derivative Claimant Awards. The Monetary Award Fund, which is funded by the NFL Parties, will pay for the compensation and reasonable costs and expenses of the Special Master and Claims Administrator.

In addition, the NFL Parties will pay up to $4 million in notice expenses. The NFL Parties will also pay attorneys' fees and costs and have agreed not to object to a petition for fees and costs that does not exceed $112.5 million. This amount to be paid by the NFL Parties is *in addition* to the amounts that the NFL Parties will pay to satisfy all Monetary Awards, finance the BAP Fund and Education Fund, and cover the costs for Class Notice and other administrative expenses.

Furthermore, Retired NFL Football Players are not precluded from participating in the Settlement as a result of having received benefits pursuant to benefit programs provided under a Collective Bargaining Agreement ("CBA") with the NFL (e.g., the 88 Plan) or because they signed releases and covenants not to sue the NFL pursuant to the Neuro–Cognitive Disability Benefit under Article 65 of the 2011 CBA. In addition to Settlement benefits, Retired NFL Football Players are entitled to seek all applicable

bargained-for benefits in the Collective Bargaining Agreements with the NFL.

In exchange for the benefits provided in the Settlement, Settlement Class Members and their related parties agree to release all claims and dismiss with prejudice all actions against, and covenant not to sue, the NFL Parties and other Released Parties and all Related Lawsuits in this Court and other courts. In contrast to the previous version of the Settlement, Settlement Class Members who receive Monetary Awards are not required to dismiss pending and/or forebear from bringing litigation relating to cognitive injuries against the National Collegiate Athletic Association ("NCAA") and any other collegiate, amateur, or youth football organizations.

## III. DISCUSSION

### A. Preliminary Approval of the Proposed Settlement

Under Federal Rule of Civil Procedure 23(e), the settlement of a class action requires court approval. Fed.R.Civ.P. 23(e)(2). Review of a proposed class action settlement typically proceeds in two stages. At the first stage, the parties submit the proposed settlement to the court, which must make a preliminary fairness evaluation. If the proposed settlement is preliminarily acceptable, the court then directs that notice be provided to all class members who would be bound by the proposed settlement in order to afford them an opportunity to be heard on, object to, and opt out of the settlement. *See* Fed. R.Civ.P. 23(c)(3), (e)(1), (e)(5). At the second stage, after class members are notified of the settlement, the court holds a formal fairness hearing where class members may object to the settlement. *See* Fed.R.Civ.P. 23(e)(1)(B). If the court concludes that the settlement is "fair, reasonable and adequate," the settlement is given final approval. Fed.R.Civ.P. 23(e)(2). At this time, Plaintiffs request that I grant preliminary approval.

#### 1. Standard of Review

In deciding whether to grant preliminary approval, a court determines whether:

the proposed settlement discloses grounds to doubt its fairness or other obvious deficiencies such as unduly preferential treatment of class representatives or segments of the class, or excessive compensation of attorneys, and whether it appears to fall within the range of possible approval.

*Mehling v. New York Life Ins.*, 246 F.R.D. 467, 472 (E.D.Pa.2007) (citations omitted); *Mack Trucks, Inc. v. Int'l Union, UAW*, No. 07–3737, 2011 WL 1833108, at *2 (E.D.Pa. May 12, 2011) (stating same standard); *Tenuto v. Transworld Sys.*, No. 99–4228, 2001 WL 1347235, at * 1 (E.D.Pa. Oct. 31, 2001) (same). Under Rule 23, a settlement falls within the "range of possible approval," if there is a conceivable basis for presuming that the standard applied for final approval—fairness, adequacy, and reasonableness—will be satisfied. *See Mehling*, 246 F.R.D. at 472. In making a preliminary determination, my first and primary concern is whether there are any obvious deficiencies that would cast doubt on the proposed settlement's fairness. I will also consider whether the negotiations occurred at arm's length, whether there was significant investigation of Plaintiffs' claims, and whether the proposed settlement provides preferential treatment to certain class members. *See In re Linerboard Antitrust Litig.*, 292 F.Supp.2d 631, 638 (E.D.Pa.2003).

## 2. Analysis

### a) There Are No Obvious Deficiencies to Cast Doubt on the Proposed Settlement's Fairness

■ The revised proposed Settlement is a significant improvement over the proposed settlement presented in January. The new Settlement ensures that there are sufficient funds available to pay all claims through the 65–year term of the Settlement and improves the manner in which diagnoses are made to protect against fraud. The original proposed Settlement with a Monetary Fund "capped" at $675 million—no matter how well supported by the parties' actuarial analyses—entailed some degree of uncertainty of payment over the 65–year term. That risk should not be imposed on the Settlement Class Members. Under the revised proposed Settlement, the Monetary Award levels remain the same, but the NFL Parties have agreed to "uncap" their obligation to pay Monetary Awards to every claimant who demonstrates a bona fide compensable condition. The parties have satisfied my concern on this fundamental issue.

### b) The Proposed Settlement Appears to Be the Product of Good Faith, Extensive Arm's Length Negotiations

Whether a settlement arises from arm's length negotiations is a key factor in deciding whether to grant preliminary approval. *See In re CIGNA Corp. Sec. Litig.*, No. 02–8088, 2007 WL 2071898, at *2 (E.D.Pa. July 13, 2007) (noting that a presumption of fairness exists where parties negotiate at arm's length, assisted by a mediator); *Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 439, 444 (E.D.Pa.2008) (stressing the importance of arm's length negotiations and highlighting the fact that the negotiations included "two full days of mediation"); *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 WL 1068807, at *2 (E.D.Pa. May 11, 2004) (preliminarily approving class action settlement that "was reached after extensive arms-length negotiation between very experienced and competent counsel"); *see also* 4 Alba Conte & Herbert Newberg, *Newberg on Class Actions*, § 11:41 (4th ed. 2010) (noting that courts usually adopt "an initial presumption of fairness when a proposed class settlement, which was negotiated at arm's length by counsel for the class, is presented for court approval").

Here, the parties participated in settlement discussions under the auspices of Judge Phillips. *See generally* Pl.'s Mot. Ex. D, Declaration of Layn R. Phillips ("Phillips Decl."), June 25, 2014, ECF No. 6073. Judge Phillips guided the parties through nearly two months of negotiations. The parties attended numerous mediation sessions and aggressively asserted their respective positions. The discussions were at times contentious. *See* Phillips Decl. ¶¶ 5–6. In the end, the parties arrived at an agreement that remains the foundation for the revised Settlement. Since the denial without prejudice of the prior motion for preliminary approval, the parties, with guidance from Spe-

cial Master Golkin, conducted further hard-fought negotiations to satisfy my concerns. Therefore, it appears that the proposed Settlement is the product of good faith, arm's length negotiations.

### c) The Investigation of Plaintiffs' Claims and the NFL Parties' Defenses Supports Preliminary Approval

Although the parties have not reached the discovery stage of litigation,[6] proposed Co-Lead Class Counsel, Class Counsel and Subclass Counsel possess adequate information concerning the strengths and weaknesses of Plaintiffs' claims against the NFL Parties. First, the proposed Settlement was reached after the parties briefed and argued the threshold issue of whether Plaintiffs' claims were preempted by federal labor law. Many, if not all, of Plaintiffs' claims could have been dismissed at this early stage of the litigation if the NFL Parties prevailed on the preemption issue. The NFL Parties could also invoke a statute of limitations defense, given that many of the Retired NFL Football Players have not played for years, or even decades, and may have had their injuries or symptoms for the same amount of time. In addition, the doctrine of assumption of risk could pose a challenge to Plaintiffs' claims in light of the risk of injury that is inherent in football. The NFL could also contest whether there existed a consensus in the scientific and medical communities at the time each player played sufficient to prove that the NFL Parties knew or should have known—and concealed—the cognitive risks of football-related concussions and sub-concussive hits. Plaintiffs also would face hurdles in proving their case-in-chief. If the litigation were to continue, Plaintiffs would be required to demonstrate that retired players' injuries were caused by NFL football play, as opposed to unrelated causes, the natural aging process, or concussions or sub-concussive hits experienced in youth or college football. Therefore, the significant legal chal-lenges facing Plaintiffs support preliminary approval of the proposed Settlement.

### d) There Appears to Be No Preferential Treatment of Certain Settlement Class Members

The proposed Settlement does not appear to provide undue preferential treatment to any individual Settlement Class Member or Subclass. Each of the two Subclasses had its own representation during settlement negotiations to ensure that all Settlement Class Members' interests were protected. The Settlement further protects the interests of those who may develop severe neurocognitive impairments in the future by "uncapping" the Monetary Award Fund; indexing the Monetary Awards for inflation; and providing eligible Settlement Class Members with Supplemental Monetary Awards if they are diagnosed with additional Qualifying Diagnoses. With the "uncapped" Monetary Award Fund, the awards paid to retired players today will have no bearing on the amount available in the future to retired players. At the same time, the Settlement provides for significant Monetary Awards to be quickly and efficiently distributed to players currently suffering from diagnosed cognitive impairments. Therefore, I preliminarily find that the Settlement does not provide preferential treatment to any segment of the Settlement Class.

In sum, the Settlement falls within the range of possible approval.

### B. Conditional Certification of the Settlement Class and Subclasses
#### 1. Standard of Review

A court must determine whether the proposed Settlement Class and Subclasses satisfy the requirements of Federal Rule of Civil Procedure 23. *See Sullivan v. DB Invs., Inc.,* 667 F.3d 273, 296 (3d Cir.2011) (en banc). At the preliminary approval stage, a court may conditionally certify the class for purposes of providing notice, leaving the final

---

6. Courts have preliminarily approved class action settlements where the litigation is in its early stages and minimal discovery has occurred. *See, e.g., In re Processed Egg Prods. Antitrust Litig.,* 284 F.R.D. 249, 267 (E.D.Pa.2012); *Gates v. Rohm & Haas Co.,* 248 F.R.D. 434, 444 (E.D.Pa.

2008); *see also Linney v. Cellular Alaska P'ship,* 151 F.3d 1234, 1239 (9th Cir.1998) (In regards to class action settlements, "formal discovery is not a necessary ticket to the bargaining table where the parties have sufficient information to make an informed decision about settlement.").

certification decision for the subsequent fairness hearing. *See Manual for Complex Litigation (Fourth)* § 21.632 (2004).

Under Rule 23(a), Plaintiffs must demonstrate that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Rule 23(b)(3), under which Plaintiffs seek class certification, requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). However, when a court is "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems ... for the proposal is that there be no trial." *Amchem v. Windsor*, 521 U.S. 591, 620, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

### 2. Analysis

#### a) Rule 23(a)

#### (i) Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." In these MDL proceedings, thousands of Retired NFL Football Players have filed suit against the NFL Parties, and the records of the NFL Parties suggest that there are over 20,000 Settlement Class Members. Pl.'s Mem. 33, June 25, 2014, ECF No. 6073. Therefore, the numerosity requirement of Rule 23(a) is easily met. *See, e.g., Stewart v. Abraham*, 275 F.3d 220, 227–28 (3d Cir.2001).

#### (ii) Commonality

■ Rule 23(a)(2) requires a showing of the existence of "questions of law or fact common to the class." The commonality element requires that plaintiffs "share at least one question of fact or law with the grievances of the prospective class." *In re Warfa-*

*rin Sodium Antitrust Litig.*, 391 F.3d 516, 527–28 (3d Cir.2004) (citations omitted). To satisfy Rule 23's commonality requirement, class claims "must depend upon a common contention ... of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal–Mart Stores, Inc. v. Dukes*, — U.S. ——, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011).

■ Questions and answers surrounding the dangers of playing NFL Football, the impairment of cognitive abilities caused by concussions, and the knowledge of the NFL Parties as to the risks presented by football-related head impacts are common to the negligence and fraud claims asserted by both the named Plaintiffs and the other members of the Settlement Class. Plaintiffs allege that the NFL Parties used the formation of the Mild Traumatic Brain Injury Committee to fraudulently conceal and to affirmatively misrepresent the long-term effects of these injuries. The answer to the question whether the NFL Parties engaged in such fraudulent concealment and/or affirmative misrepresentation is relevant to the claims of all Settlement Class Members. Thus, the commonality requirement is tentatively satisfied by this common question and answer.

#### (iii) Typicality

Rule 23(a)(3) requires that the class representatives' claims be "typical of the claims ... of the class." "The typicality inquiry is intended to assess ... whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." *Baby Neal v. Casey*, 43 F.3d 48, 57–58 (3d Cir.1994); *see also In re Warfarin*, 391 F.3d at 532 (finding typicality prong met where "claims of representative plaintiffs arise from the same alleged wrongful conduct").

■ Shawn Wooden is a Retired NFL Football Player who has not been diagnosed with a Qualifying Diagnosis and is a representative of Subclass 1. Like many other

proposed Settlement Class Members, he has sued the NFL Parties seeking a baseline assessment screening to determine whether he has any neurocognitive impairment resulting from his years of playing NFL football. In the event he is diagnosed with a Qualifying Diagnosis in the future, he has indicated that he will seek a Monetary Award. Kevin Turner is a Retired NFL Football Player who has been diagnosed with ALS and is a representative of Subclass 2. Similar to other proposed Settlement Class Members who have already received a diagnosis of cognitive impairment, he seeks compensation from the NFL Parties for his injuries. In all cases, the claims of the Subclass Representatives and other Settlement Class Members are based on the same legal theories of negligence and fraud and arise from the same alleged wrongful conduct by the NFL Parties. Thus, Wooden's and Turner's claims appear typical of those of other Settlement Class Members in their respective Subclasses and the Settlement Class as a whole, and the typicality requirement is satisfied for the purposes of preliminary approval.

### (iv) Adequacy of Representation

Rule 23(a)(4) requires representative parties to "fairly and adequately protect the interests of the class." This requirement "serves to uncover conflicts of interest between the named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625, 117 S.Ct. 2231. A class action settlement must provide "structural assurance of fair and adequate representation for the diverse groups and individuals affected." *Id.* at 627, 117 S.Ct. 2231.

■ First, each Subclass Representative's interests reflect the interests of the Subclass as a whole. As with all other retired players who have already received a Qualifying Diagnosis, Kevin Turner is interested in immediately obtaining the greatest possible compensation for his injuries and symptoms. Shawn Wooden, like all other retired players who were exposed to the risk of head injury but have not yet received a Qualifying Diagnosis, is interested not only in compensation for a future diagnosis, but also a guarantee that compensation will be available at that time.

Thus, the interests of all Settlement Class Members—both those who have already received a Qualifying Diagnoses and those who remain at risk for receiving one—are protected by the Subclass Representatives.

Second, by dividing the Settlement Class into two Subclasses and providing each Subclass with its own counsel, the Settlement is structured to alleviate any possible conflict between the interests of those Settlement Class Members who have already been diagnosed with a Qualifying Diagnosis (Subclass 2) and those who have not (Subclass 1). *See Ortiz v. Fibreboard*, 527 U.S. 815, 856, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999) (holding that an intra-class conflict "require[d] division into homogeneous subclasses ... with separate representation to eliminate conflicting interests"). The "uncapped" Monetary Award Fund, inflation-adjusted Monetary Awards, and Supplemental Monetary Awards for retired players subsequently diagnosed with more severe Qualifying Diagnoses all protect the interests of Subclass 1. *See In re Diet Drugs Prods. Liab. Litig.*, No. 1203, 99–20593, 2000 WL 1222042, *49 (E.D.Pa. Aug. 28, 2000) (holding that "step-up" provision and inflation indexing provided adequate structural protections). This factor weighs in favor of conditionally certifying the Settlement Class and Subclasses.

### b) Rule 23(b)(3)

Under Federal Rule of Civil Procedure 23(b)(3), a class action may be maintained if common questions of law or fact predominate questions arguably affecting only individuals. The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," *Amchem*, 521 U.S. at 624, 117 S.Ct. 2231, and assesses whether a class action "would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated." Fed.R.Civ.P. 23(b)(3) Advisory Committee's Note to 1966 Amendment.

■ Plaintiffs' claims for medical monitoring and compensatory relief rely upon a common legal theory related to the singular body of facts concerning the NFL Parties' knowledge and alleged concealment and misrepre-

sentation of the dangers of concussions in football. *See Amgen Inc. v. Connecticut Retirement Plans & Trust Funds,* —— U.S. ——, 133 S.Ct. 1184, 1191, 185 L.Ed.2d 308 (2013) ("Because materiality is judged according to an objective standard, the materiality of Amgen's alleged misrepresentations and omissions is a question common to all members of the class ...."). The issues surrounding the NFL Parties' alleged liability for the injuries suffered by Settlement Class Members appear to predominate over any individual issues involving Plaintiffs.

Rule 23(b)(3)'s "superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *In re Warfarin,* 391 F.3d at 533–34 (citation and internal quotation marks omitted). Given the hundreds of suits already commenced against the Released Parties in federal and state courts, a class action Settlement and resolution of all claims against the NFL Parties in this forum seems to be a superior alternative to other methods of adjudication. If the cases filed by Plaintiffs against the NFL Parties were litigated individually, the parties could face decades of litigation and significant expense in many different state and federal courts, potentially resulting in conflicting rulings. Compensation resulting from litigation is highly uncertain and may not be received before lengthy and costly trial and appellate proceedings are complete. Many members of the proposed Settlement Class suffer from severe neurodegenerative conditions that may worsen over time. The proposed class action Settlement should more quickly make resources and compensation available for these retired players. A class action settlement that offers prompt relief is superior to the likely alternative—years of expensive, difficult, and uncertain litigation, with no assurance of recovery, while retired players' physical and mental conditions continue to deteriorate.

The Settlement Class and Subclasses preliminarily satisfy the requirements of Rule 23, and conditional certification is appropriate.

## C. Approval of the Notice Plan and Proposed Notice Forms

### 1. Standard of Review

Under Rule 23(e)(1) of the Federal Rules of Civil Procedure, a district court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed.R.Civ.P. 23(e)(1). In addition, for classes certified under Rule 23(b)(3), courts must ensure that class members receive "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed.R.Civ.P. 23(c)(2)(B); *see Amchem,* 521 U.S. at 617, 117 S.Ct. 2231.

■ Due process requires that notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Rule 23(c)(2)(B) provides that the "notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)." Fed.R.Civ.P. 23(c)(2)(B).

### 2. Analysis

■ The dissemination of notice under the proposed Settlement Class Notice Plan ("Notice Plan") satisfies the requirements of Rule 23 and due process. *See Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.,* 758 F.2d 86, 90 (3d Cir.1985) ("It is well settled that in the usual situation first-class mail and publication in the press fully satisfy the notice requirements of both Fed.R.Civ.P. 23 and the due process clause."). The Notice Plan includes direct individual notice to identifiable Retired NFL Football Players

and their heirs and paid publication notice in various media sources including targeted notice to third parties, such as nursing homes. *See* Pl.'s Mot. Ex. C, Declaration of Katherine Kinsella ("Kinsella Decl."), June 25, 2014, ECF No. 6073. Many Retired NFL Football Players will be reachable through direct individual notice due to the existence of multiple lists—including pension program lists and lists compiled in prior litigation—identifying former NFL players. Co–Lead Class Counsel also plan to use full-page color ads in selected consumer magazines; thirty-second television spots on the NFL Network, other cable networks, and broadcast outlets; Internet ads using non-static preroll, flash, and rich media; and radio spots to disseminate notice. Plaintiffs' notice experts estimate that the Notice Plan will reach approximately 90% of the Settlement Class Members, well above levels deemed adequate in other class actions. *See* Kinsella Decl. ¶ 36; *see also In re Heartland Payment Systems, Inc. Customer Data Sec. Breach Litig.*, 851 F.Supp.2d 1040, 1061 (S.D.Tex. 2012) (notice plan that expert estimated would reach 81.4% of class was sufficient); *Alberton v. Commonwealth Land Title Ins. Co.*, No. 06–3755, 2008 WL 1849774, at *3 (E.D.Pa. Apr. 25, 2008) (direct notice projected to reach 70% of class plus publication in newspapers and Internet was sufficient); *Grunewald v. Kasperbauer*, 235 F.R.D. 599, 609 (E.D.Pa.2006) (direct mail to 55% of class and publication in three newspapers and Internet was sufficient).

██ The form and content of the proposed Long–Form Notice and Summary Notice also satisfy the requirements of Rule 23 and the Due Process clause. *See* Pl.'s Mem. Ex. C, Ex. 3 & 5, June 25, 2014, ECF No. 6073. Each form of notice is written in plain and straightforward language consistent with Rules 23(c)(2)(B) and 23(e)(1). The Long–Form Notice objectively apprises all Settlement Class Members of the nature of the action; the definition of the Settlement Class; the Settlement Class claims and issues; that Settlement Class Members may enter an appearance through an attorney at the Fairness Hearing (in accordance with the procedures set forth in the Notice); that Settlement Class Members may elect to opt out of the Settlement (and sets forth the procedures and deadlines for doing so); and the binding effect of a class judgment on Settlement Class Members under Rule 23(c)(3)(B). The Long–Form Notice also discloses the date, time, and location of the Fairness Hearing. Finally, the proposed Notice Plan provides that the Class Members will have approximately 90 days to opt out. It is well-settled that between 30 and 60 days is sufficient to allow class members to make their decisions to accept the settlement, object, or exclude themselves. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F.Supp. 450, 562 (D.N.J.1997) (citing cases).

I will approve the proposed Settlement Class Notice Plan and proposed notices because they meet the requirements of Rule 23 and due process.

### D. Stay and Injunction

Plaintiffs request that I stay this action and all actions consolidated before me in this MDL. Plaintiffs also request that I enjoin all proposed Settlement Class Members from commencing, prosecuting, or participating in any way in any other lawsuit or legal action based on the facts and circumstances at issue in this case in any jurisdiction unless and until they have opted out of the Settlement Class, approval of the Class Action Settlement is denied, or the Settlement Agreement is otherwise terminated.[7]

The All Writs Act authorizes courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). However, the Anti–Injunction Act limits a court's authority to issue "an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. "The parallel 'necessary in aid of jurisdiction' language is construed similarly in both the All–Writs Act and the Anti–Injunction Act." *Car-*

---

7. No such stay or injunction applies to the Riddell Defendants.

**204**

*lough v. Amchem Prods., Inc.*, 10 F.3d 189, 201 n. 9 (1993). "The two statutes act in concert to permit issuance of an injunction." *Id.*

■■ "Under an appropriate set of facts, a federal court entertaining complex litigation, especially when it involves a substantial class of persons from multiple states, or represents a consolidation of cases from multiple districts, may appropriately enjoin state court proceedings in order to protect its jurisdiction." *In re Diet Drugs*, 282 F.3d 220, 235 (3d Cir.2002). Thus, the "necessary in aid of its jurisdiction" exception to the Anti-Injunction Act applies to "consolidated multidistrict litigation, where a parallel state court action threatens to frustrate proceedings and disrupt the orderly resolution of the federal litigation." *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 365 (3d Cir.2001) (internal quotation marks omitted). "The threat to the federal court's jurisdiction posed by parallel state actions is particularly significant where there are conditional class certifications and impending settlements in federal actions." *In re Diet Drugs*, 282 F.3d at 236. "In complex cases where certification or settlement has received conditional approval ... the challenges facing the overseeing court are such that it is likely that almost any parallel litigation in other fora presents a genuine threat to the jurisdiction of the federal court." *Id.*

■■ This is a complex, multidistrict litigation involving more than 300 consolidated actions with over 5,000 plaintiffs and a proposed class with over 20,000 members. Without the requested stay and injunction, the NFL Parties and other Released Parties remain exposed to "countless suits in state court despite settlement of the federal claims" that "would seriously undermine the possibility for settling [this] large, multi-district class action." *In re Prudential*, 261

1. Capitalized terms used in this Order have the same meaning as those defined in the June 25, 2014 Class Action Settlement Agreement. *See* Pl.'s Mot. Ex. B, June 25, 2014, ECF No. 6037.

2. "Preliminary Approval and Class Certification Order" is defined in the June 25, 2014 Class Action Settlement Agreement as the Court's or-

F.3d at 367. Therefore, I will issue the requested stay and injunction.

## IV. CONCLUSION

For the foregoing reasons, I will grant Plaintiffs' motion. An appropriate order with deadlines follows.

### *ORDER*[1]

On June 25, 2014, Plaintiffs Kevin Turner and Shawn Wooden, through their proposed Co–Lead Class Counsel, Class Counsel, and Subclass Counsel, filed a motion for an order: (1) granting preliminary approval of the proposed Class Action Settlement Agreement; (2) conditionally certifying a Settlement Class and Subclasses; (3) appointing Co-Lead Class Counsel, Class Counsel, and Subclass Counsel; (4) approving the dissemination of class notice; (5) scheduling a Fairness Hearing; and (6) staying matters as to the Released Parties and enjoining proposed Settlement Class Members from pursuing Related Lawsuits [ECF No. 6073].

**AND NOW,** this 7th day of July, 2014, it is **ORDERED** as follows:

1. The proposed Class Action Settlement Agreement is preliminarily approved.
2. The Settlement Class and Subclasses are conditionally certified for settlement purposes only.
   a. The Settlement Class consists of:
      i. All living NFL Football Players who, prior to the date of the Preliminary Approval and Class Certification Order,[2] retired, formally or informally, from playing professional football with the NFL or any Member Club, including American Football League, World League of American Football, NFL Europe League and NFL Europa League players, or were formerly on any roster, including preseason, regular season, or postseason, of any such Member Club or league and who no

der preliminarily approving the Class Action Settlement and conditionally certifying the Settlement Class and Subclasses. *See* Pl.'s Mot. Ex. B, June 25, 2014, ECF No. 6037. For the avoidance of any ambiguity, this Order is the "Preliminary Approval and Class Certification Order."

longer are under contract to a Member Club and are not seeking active employment as players with any Member Club, whether signed to a roster or signed to any practice squad, developmental squad, or taxi squad of a Member Club ("Retired NFL Football Players");

ii. Authorized representatives, ordered by a court or other official of competent jurisdiction under applicable state law, of deceased or legally incapacitated or incompetent Retired NFL Football Players ("Representative Claimants"); and

iii. Spouses, parents, children who are dependents, or any other persons who properly under applicable state law assert the right to sue independently or derivatively by reason of their relationship with a Retired NFL Football Player or deceased Retired NFL Football Player ("Derivative Claimants").

b. The Settlement Subclasses consist of:

i. Subclass 1: Retired NFL Football Players who were not diagnosed with a Qualifying Diagnosis [3] prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants; and

ii. Subclass 2: Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants, and the Representative Claimants of deceased Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to death or who died prior to the date of the Preliminary Approval and Class Certification Order and who received a post-mortem diagnosis of CTE.

c. The Subclass Representatives for each of the Settlement Subclasses are preliminarily appointed as follows:

i. Shawn Wooden is appointed as Subclass Representative for Subclass 1.

ii. Kevin Turner is appointed as Subclass Representative for Subclass 2.

3. Co–Lead Class Counsel, Class Counsel, Subclass Counsel, and the following administrators are appointed as follows:

a. Christopher A. Seeger, Sol Weiss, Arnold Levin, Dianne M. Nast, Steven C. Marks, and Gene Locks are appointed as Class Counsel.

b. Christopher A. Seeger and Sol Weiss are appointed as Co–Lead Class Counsel.

c. Arnold Levin is appointed as Subclass Counsel for Subclass 1, and Dianne M. Nast is appointed as Subclass Counsel for Subclass 2.

d. Plaintiffs' Executive Committee and Plaintiffs' Steering Committee are appointed as Of Counsel.

e. The Garretson Resolution Group, Inc. is preliminarily appointed to serve as the Baseline Assessment Program ("BAP") Administrator and Lien Resolution Administrator.

f. BrownGreer PLC is preliminarily appointed to serve as the Claims Administrator.

g. Citibank, N.A. is preliminarily appointed as the Trustee.

h. Kinsella Media, LLC is appointed to serve as the Settlement Class Notice Agent.

4. The dissemination of class notice is approved as follows:

a. The protocol for dissemination of notice to Settlement Class and Subclass Members, as set forth in the Settlement Class Notice Plan, is approved.

b. The templates [4] of the Long–Form Notice and the Summary Notice, at-

---

**3.** "Qualifying Diagnosis" is defined in Exhibit 1 of the June 25, 2014 Class Action Settlement Agreement as Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, ALS, and/or Death with CTE. *See* Pl.'s Mot. Ex. B, June 25, 2014. ECF No. 6037.

**4.** The Long–Form Notice and the Summary Notice are only templates because additional details must be inserted before dissemination.

tached to this Order as Exhibits 1 and 2, respectively, are approved. The parties must submit to the Court completed versions of the Long–Form Notice and the Summary Notice before they are posted on the Settlement Website.

c. On or before *July 11, 2014,* the NFL Parties must transfer the Class Notice Payment to Co–Lead Class Counsel.

d. On or before *July 14, 2014,* the Long–Form Notice must be posted on the Settlement Website.

e. On or before *July 24, 2014,* Co–Lead Class Counsel must cause the Long–Form Notice to be sent via first-class mail, postage prepaid to: (i) all known Retired NFL Football Players, their Representative Claimants and Derivative Claimants and (ii) counsel for Retired NFL Football Players, their Representative Claimants and Derivative Claimants, if known. Where an attorney represents more than one Settlement Class Member, it is sufficient to provide that attorney with a single copy of the notice. Notice to a Settlement Class Member's counsel of record constitutes notice to the Settlement Class Member, even if the Settlement Class Member does not receive independent notice.

f. On or before *September 15, 2014,* Co–Lead Class Counsel must cause publication notice to be initiated in various media as follows:

i. Full-page ads featuring the Summary Notice in *Time, Ebony, People, Sports Illustrated,* and senior living trade publications;

ii. Thirty-second television commercials on a combination of broadcast and cable networks, including the NFL Network;

iii. Thirty-second radio commercials on American Urban Radio Networks;

iv. Internet banner ads on targeted websites (NFL.com, CNN.com, Facebook.com. and Weather.com) and Internet advertising networks; and

v. Keyword search ads on the Google and Bing search engines.

g. The Opt Out procedure set forth in Section 14.2 of the Settlement Agreement is approved. Written requests to Opt Out must be postmarked on or before *October 14, 2014.* The attached Long–Form Notice explains the Opt Out procedure.

h. The objection procedure set forth in Section 14.3 of the Settlement Agreement is approved. Written objections must be postmarked on or before *October 14, 2014.* The attached Long–Form Notice explains the objection procedure.

i. On or before *November 3, 2014,* any Settlement Class Member (or any attorney representing a Settlement Class Member) seeking to speak at the Fairness Hearing must send to the Court written notice of his or her intention to speak at the Fairness Hearing.

j. On or before *November 3, 2014,* BrownGreer PLC must prepare and file with the Court, and serve on Class Counsel and Counsel for the NFL Parties, a list of all persons who have timely Opted Out of the Settlement Class.

k. On or before *November 12, 2014,* Class Counsel and Counsel for the NFL Parties must file any response to the objections or any papers in support of final approval of the Settlement.

5. The request to schedule a Fairness Hearing is granted. A Fairness Hearing will take place on *Wednesday, November 19, 2014 at 10:00 a.m.,* at the United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania 19106 in Courtroom 7B in order to consider comments on and objections to the proposed Settlement Agreement and to consider whether: (a) to approve the Settlement Agreement as fair, reasonable and adequate, pursuant to Rule 23 of the Federal Rules of Civil Procedure, (b) to certify the Settlement Class and Subclasses, and (c) to enter the Final Order

and Judgment, as provided in Article XX of the Settlement Agreement. The Fairness Hearing is subject to postponement Or adjournment by the Court without further notice.

6. This action and all actions consolidated before the Court in this Multidistrict Litigation are stayed. All proposed Settlement Class Members are enjoined from filing, commencing, prosecuting, intervening in, participating in, continuing to prosecute and/or maintaining, as plaintiffs, claimants, or class members, any other lawsuit, including, without limitation, a Related Lawsuit, or administrative, regulatory, arbitration, or other proceeding in any jurisdiction (whether state, federal or otherwise), against Released Parties based on, relating to, or arising out of the claims and causes of action, or the facts and circumstances at issue, in the Class Action Complaint, Related Lawsuits and/or the Released Claims. However, claims for workers'

5. It is further **ORDERED** that the NFL Parties have the right to communicate orally and in writing with, and to respond to inquiries from,

compensation and claims alleging entitlement to NFL CBA Medical and Disability Benefits are not stayed or enjoined. The stay and injunction will remain in effect unless and until a proposed Settlement Class Member's Opt Out becomes effective on the date this Court grants Final Approval, approval of the Settlement Agreement is denied, or the Settlement Agreement is otherwise terminated. No such stay or injunction applies to the Riddell Defendants.

7. If the Settlement Agreement is terminated or is not consummated for any reason, the preliminary certification of the Settlement Class and Subclasses is void, and Plaintiffs and NFL Parties are deemed to have reserved all of their rights to propose or oppose any and all class certification issues.[5]

## EXHIBIT 1

Settlement Class Members on matters unrelated to the Class Action Settlement in connection with the NFL Parties' normal business.

**208**

# NFL Concussion Settlement

## All Valid Claims of Retired NFL Football Players to be Paid in Full for 65 Years

### Monetary Awards, Baseline Medical Exams and Other Benefits Provided

*A federal court authorized this Notice  This is not a solicitation from a lawyer.*

- The National Football League ("NFL") and NFL Properties, LLC (collectively, "NFL Parties") have agreed to a Settlement of a class action lawsuit seeking medical monitoring and compensation for brain injuries allegedly caused by head impacts experienced in NFL football.  The NFL Parties deny that they did anything wrong.

- The Settlement Class includes all retired players of the NFL, American Football League ("AFL"), World League of American Football, NFL Europe League and NFL Europa League, as well as authorized representatives of deceased, legally incapacitated or incompetent retired players and family members of retired players who meet certain criteria.

- The Settlement will provide eligible retired players with:

  - Baseline neuropsychological and neurological exams to determine if retired players are: a) currently suffering from any neurocognitive impairment, including impairment serious enough for compensation, and b) eligible for additional testing and/or treatment ($75 million);

  - Monetary awards for diagnoses of ALS (Lou Gehrig's disease), Parkinson's Disease, Alzheimer's Disease, early and moderate Dementia and certain cases of chronic traumatic encephalopathy (CTE) (a neuropathological finding) diagnosed after death.  The maximum monetary awards range from $1.5 million to $5 million depending on the diagnosis.  There is no cap on the amount of funds available to pay these Monetary Awards and all valid claims will be paid in full for 65 years; and

  - Education programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of retired players regarding the NFL's medical and disability programs and other educational programs and initiatives ($10 million).

- Authorized representatives of deceased, legally incapacitated or incompetent retired players and family members of retired players who meet certain criteria may also file claims for monetary awards (*see* Question 6).

- To get money, proof that injuries were caused by playing NFL football is not required.

- **Settlement Class Members will need to register to get benefits. Settlement Class Members may sign up at the website or call 1-800-000-000 for additional information about the Settlement and updates on the registration process.**

(Continued on next page)

Case 2:12-md-02323-AB   Document 6084-1   Filed 07/07/14   Page 2 of 20

TEMPLATE

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **STAY IN THE SETTLEMENT CLASS** | To be included in the Settlement Class, no action is needed. Once the Court approves the Settlement, you will be bound by the terms and releases contained in the Settlement. To receive benefits, however, you will need to register at a later date (*see* Question 26). |
| **EXCLUDE YOURSELF (OPT OUT)** | If you exclude yourself (opt out), you will get no benefits from the Settlement. This is the only option that allows you to participate in any other lawsuit against the NFL Parties about the claims in this case (*see* Question 30). |
| **OBJECT** | Write to the Court if you do not like the Settlement (*see* Question 35). |

- These rights and options—**and the deadlines to exercise them**—are explained in this Notice.

- The Court in charge of this case still has to decide whether to grant final approval of the Settlement.

**This Notice is only a summary of the Settlement Agreement and your rights. You are encouraged to carefully review the complete Settlement Agreement at www.NFLConcussionSettlement.com.** The Settlement Agreement is also on file with the Clerk of the Court for the U.S. District Court for the Eastern District of Pennsylvania (*see* Question 35 for the address). You can also get this information by calling 1-800-000-0000.

**210**

TEMPLATE

| What This Notice Contains |
| --- |

# CHAPTER 1: INTRODUCTION

**BASIC INFORMATION**.................................................................................**Page 5**
1.   Why is this Notice being provided?
2.   What is the litigation about?
3.   What is a class action?
4.   Why is there a Settlement?
5.   What are the benefits of the Settlement?

**THE SETTLEMENT**.......................................................................................**Page 7**
6.   Who is included in the Settlement Class?
7.   What players are not included in the Settlement Class?
8.   What if I am not sure whether I am included in the Settlement Class?
9.   What are the different levels of neurocognitive impairment?
10.  Must a retired player be vested under the NFL Retirement Plan to receive Settlement benefits?

# CHAPTER 2: SETTLEMENT BENEFITS

**THE BASELINE ASSESSMENT PROGRAM**.....................................................**Page 9**
11.  What is the Baseline Assessment Program ("BAP")?
12.  Why should a retired player get a BAP baseline examination?
13.  How does a retired player schedule a baseline assessment examination and where will it be done?

**MONETARY AWARDS**..................................................................................**Page 10**
14.  What diagnoses qualify for monetary awards?
15.  Do I need to prove that playing football caused the Qualifying Diagnosis?
16.  How much money will I receive?
17.  How does the age of the retired player at the time of first diagnosis affect a monetary award?
18.  How does the number of seasons a retired player played affect a monetary award?
19.  How do prior strokes or brain injuries of a retired player affect a monetary award?
20.  How is a retired player's monetary award affected if he does not participate in the BAP program?
21.  Can I receive a monetary award even though the retired player is dead?
22.  Will this Settlement affect a retired player's participation in NFL or NFLPA related benefits programs?
23.  Will this Settlement prevent retired players from bringing workers' compensation claims?

**EDUCATION FUND**......................................................................................**Page 14**
24.  What types of education programs are supported by the Settlement?

# CHAPTER 3: YOUR RIGHTS

**REMAINING IN THE SETTLEMENT**................................................................**Page 15**
25.  What am I giving up to stay in the Settlement Class?

<u>TEMPLATE</u>

**HOW TO GET BENEFITS**.................................................................................**Page 15**
26. How do I get Settlement benefits?
27. Is there a time limit to file claims for monetary awards?
28. Can I re-apply for compensation if my claim is denied?
29. Can I appeal the determination of my monetary award claim?

**EXCLUDING YOURSELF (OPTING OUT) FROM THE SETTLEMENT**........................**Page 16**
30. How do I get out of the Settlement?
31. If I do not exclude myself (opt out), can I sue the NFL Parties for the same thing later?
32. If I exclude myself (opt out), can I still get benefits from this Settlement?

**THE LAWYERS REPRESENTING YOU**.............................................................**Page 17**
33. Do I have a lawyer in the case?
34. How will the lawyers be paid?

**OBJECTING TO THE SETTLEMENT**................................................................**Page 18**
35. How do I tell the Court if I do not like the Settlement?
36. What is the difference between objecting to the Settlement and excluding myself (opting out)?

**THE COURT'S FAIRNESS HEARING**................................................................**Page 19**
37. When and where will the Court hold a Fairness Hearing concerning the Settlement?
38. Do I have to attend the hearing?
39. May I speak at the hearing?

**GETTING MORE INFORMATION**......................................................................**Page 19**
40. How do I get more information?

QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM

Exhibit 5                                                                                     Page 4

**212**

<u>TEMPLATE</u>

# CHAPTER 1: INTRODUCTION

## BASIC INFORMATION

**1. Why is this Notice being provided?**

The Court in charge of this case authorized this Notice because you have a right to know about the proposed Settlement of this lawsuit and about all of your options before the Court decides whether to give final approval to the Settlement. This Notice summarizes the Settlement and explains your legal rights and options.

This case is being heard in the U.S. District Court for the Eastern District of Pennsylvania. The case is known as *In re: National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323. The people who sued are called the "Plaintiffs." The National Football League and NFL Properties, LLC are called the "NFL Defendants."

The Settlement may affect your rights if you are: (a) a retired player of the NFL, AFL, World League of American Football, NFL Europe League or NFL Europa League, (b) an authorized representative of a deceased, legally incapacitated or incompetent retired player of those leagues, or (c) an individual with a close legal relationship with a retired player of those leagues, such as a spouse, parent or child.

**2. What is the litigation about?**

The Plaintiffs claim that retired players experienced head trauma during their NFL football playing careers that resulted in brain injuries, which have caused or may cause them long-term neurological problems. The Plaintiffs accuse the NFL Parties of being aware of the evidence and the risks associated with repetitive traumatic brain injuries but failing to warn and protect the players against the long-term risks, and ignoring and concealing this information from the players. The NFL Parties deny the claims in the litigation.

**3. What is a class action?**

In a class action, one or more people, the named plaintiffs (who are also called proposed "class representatives") sue on behalf of themselves and other people with similar claims. All of these people together are the proposed "class" or "class members." When a class action is settled, one court resolves the issues for all class members (in the settlement context, "settlement class members"), except for those who exclude themselves (opt out) from the settlement. In this case, the proposed class representatives are Kevin Turner and Shawn Wooden. Excluding yourself (opting out) means that you will not receive any benefits from the Settlement. The process for excluding yourself (opting out) is described in Question 30.

**4. Why is there a Settlement?**

After extensive settlement negotiations mediated by retired United States District Court Judge Layn Phillips, and further settlement negotiations under the supervision of the Court-appointed Special Master, Perry Golkin, the Plaintiffs and the NFL Parties agreed to the Settlement.

## TEMPLATE

A settlement is an agreement between a plaintiff and a defendant to resolve a lawsuit. Settlements conclude litigation without the court or a jury ruling in favor of the plaintiff or the defendant. A settlement allows the parties to avoid the cost and risk of a trial, as well as the delays of litigation.

If the Court approves this Settlement, the litigation between the Settlement Class Members and the NFL Parties is over. Only Settlement Class Members are eligible for the benefits summarized in this Notice. The NFL Parties will no longer be legally responsible to defend against the claims by Settlement Class Members made in this litigation.

The Court has not and will not decide in favor of the retired players or the NFL Parties. By reviewing this Settlement, the Court is not making and will not make any findings that any law was broken or that the NFL Parties did anything wrong.

The proposed Class Representatives and their lawyers ("Co-Lead Class Counsel," "Class Counsel," and "Subclass Counsel," *see* Question 33) believe that the proposed Settlement is best for everyone who is affected. The factors that Co-Lead Class Counsel, Class Counsel and Subclass Counsel considered included the uncertainty and delay associated with continued litigation, a trial and appeals and the uncertainty of particular legal issues that are yet to be determined by the Court. Co-Lead Class Counsel, Class Counsel and Subclass Counsel balanced these and other substantial risks in determining that the Settlement is fair, reasonable and adequate in light of all circumstances and in the best interests of the Settlement Class Members.

The Settlement Agreement is available at www.NFLConcussionSettlement.com. The Settlement Agreement is also on file with the Clerk of the Court for the U.S. District Court for the Eastern District of Pennsylvania (*see* Question 35 for the address). You can also get this information by calling 1-800-000-0000.

**5. What are the benefits of the Settlement?**

Under the Settlement, the NFL Parties will pay to fund:

- Baseline neuropsychological and neurological examinations for eligible retired players, and additional medical testing, counseling and/or treatment if they are diagnosed with moderate cognitive impairment during the baseline examinations (up to $75 million, "Baseline Assessment Program") (*see* Questions 11-13);

- Monetary awards for diagnoses of Death with CTE prior to **July 7, 2014**, ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.,* moderate Dementia) and Level 1.5 Neurocognitive Impairment (*i.e.,* early Dementia) (*see* Questions 14-21); **All valid claims under the Settlement, without limitation, will be paid in full throughout the 65-year life of the Settlement (the "Monetary Award Fund"); and**

- Education programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of retired players regarding the NFL's medical and disability programs and other educational programs and initiatives ($10 million) (*see* Question 24).

In addition, the NFL Parties will pay the cost of notifying the Settlement Class. Administrative costs and expenses will be paid out of the Monetary Award Fund. The Baseline Assessment Program costs and expenses will be paid out of the Baseline Assessment Program Fund.

QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM

Exhibit 5                                                                    Page 6

**214**

TEMPLATE

The details of the Settlement benefits are in the Settlement Agreement, which is available at www.NFLConcussionSettlement.com. The Settlement Agreement is also on file with the Clerk of the Court for the U.S. District Court for the Eastern District of Pennsylvania (*see* Question 35 for the address). You can also get this information by calling **1-800-000-0000**.

**Note:** The Baseline Assessment Program and Monetary Award Fund will be administered independently of the NFL Parties and any benefit programs that have been created between the NFL and the NFL Players Association. The NFL Parties are not involved in determining the validity of claims under the Settlement.

## THE SETTLEMENT

**6. Who is included in the Settlement Class?**

This Settlement Class includes three types of people:

Retired NFL Football Players: All living NFL Football players who, prior to **July 7, 2014**, (1) have retired, formally or informally, from playing professional football with the NFL or any Member Club, including AFL, World League of American Football, NFL Europe League and NFL Europa League players, or (2) were formerly on any roster, including preseason, regular season, or postseason, of any such Member Club or league and no longer are under contract to a Member Club and are not seeking active employment as a player with any Member Club, whether signed to a roster or signed to any practice squad, developmental squad, or taxi squad of a Member Club.

Representative Claimants: Authorized representatives, ordered by a court or other official of competent jurisdiction under applicable state law, of deceased, legally incapacitated or incompetent Retired NFL Football Players.

Derivative Claimants: Spouses, parents, dependent children, or any other persons who properly under applicable state law assert the right to sue independently or derivatively by reason of their relationship with a living or deceased Retired NFL Football Player. (For example, a spouse asserting the right to sue due to the injury of a husband who is a Retired NFL Football Player.)

The Settlement recognizes two separate groups ("Subclasses") of Settlement Class Members based on the Retired NFL Football Player's injury status prior to **July 7, 2014**:

- Subclass 1 includes: Retired NFL Football Players who were <u>not</u> diagnosed with ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) or Death with CTE prior to **July 7, 2014**, and their Representative Claimants and Derivative Claimants.

- Subclass 2 includes:

  o Retired NFL Football Players who <u>were</u> diagnosed with ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia) or Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) prior to **July 7, 2014**, and their Representative Claimants and Derivative Claimants; and

TEMPLATE

o Representative Claimants of deceased Retired NFL Football Players who were diagnosed with ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia) or Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) prior to death or who died prior to **July 7, 2014** and received a diagnosis of Death with CTE.

### 7. What players are not included in the Settlement Class?

The Settlement Class does not include current NFL players. The Settlement Class also does not include people who tried out for but did not make it onto preseason, regular season or postseason rosters or practice, developmental or taxi squads of the NFL or any Member Clubs.

### 8. What if I am not sure whether I am included in the Settlement Class?

If you are not sure whether you are included in the Settlement Class, you may call **1-800-000-0000** with questions or visit www.NFLConcussionSettlement.com. You may also write with questions to NFL Concussion Settlement, **P.O. Box 0000, City, ST 00000**. You may also consult with your own attorney.

### 9. What are the different levels of neurocognitive impairment?

In addition to ALS, Parkinson's Disease and Alzheimer's Disease, various levels of neurocognitive impairment are covered by this Settlement. More details can be found in the Injury Definitions, which are available at www.NFLConcussionSettlement.com or by calling **1-800-000-0000**.

The level of Neurocognitive Impairment will be established in part with evidence of decline in performance in at least two areas subject to clinical evaluative testing, provided one of the areas is executive function, learning and memory, or complex attention, and related functional impairment as follows:

| LEVEL OF NEUROCOGNITIVE IMPAIRMENT | TYPE OF IMPAIRMENT | DEGREE OF DECLINE |
|---|---|---|
| Level 1 | Moderate cognitive impairment | Moderate cognitive decline |
| Level 1.5 | Early Dementia | Moderate to severe cognitive decline |
| Level 2 | Moderate Dementia | Severe cognitive decline |

If neurocognitive impairment is temporary and only occurs with delirium, or as a result of substance abuse or medicinal side effects, it is not covered by the Settlement.

### 10. Must a retired player be vested under the NFL Retirement Plan to receive Settlement benefits?

No. A retired player can be a Settlement Class Member regardless of whether he is vested due to credited seasons or total and permanent disability under the Bert Bell/Pete Rozelle NFL Player Retirement Plan.

## CHAPTER 2:   SETTLEMENT BENEFITS

QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM

Exhibit 5                                                                                        Page 8

216

TEMPLATE

## THE BASELINE ASSESSMENT PROGRAM

**11.  What is the Baseline Assessment Program ("BAP")?**

All living retired players who have earned at least one-half of an Eligible Season (*see* Question 18), who do not exclude themselves (opt out) from the Settlement (*see* Question 30), and who timely register to participate in the Settlement (*see* Question 26) may participate in the Baseline Assessment Program ("BAP").

The BAP will provide baseline neuropsychological and neurological assessment examinations to determine whether retired players are currently suffering from cognitive impairment.  Retired players will have from two to ten years, depending on their age as of the date the Settlement is finally approved and any appeals are fully resolved ("Final Settlement Approval"), to have a baseline examination conducted through a nationwide network of qualified and independent medical providers.

- Retired players 43 or older as of the date of Final Settlement Approval will need to have a baseline examination within two years of the start of the BAP.

- Retired players under the age of 43 as of the date the date of Final Settlement Approval will need to have a baseline examination within 10 years of the start of the BAP, or before they turn 45, whichever comes sooner.

Retired players who are diagnosed with Level 1 Neurocognitive Impairment (*i.e.*, moderate cognitive impairment) are eligible to receive further medical testing and/or treatment (including counseling and pharmaceuticals) for that condition during the ten-year term of the BAP or within five years from diagnosis, whichever is later.

Retired players who participate in the BAP will be encouraged to provide their confidential medical records for use in research into cognitive impairment and safety and injury prevention with respect to football players.

Although all retired players are encouraged to take advantage of the BAP and receive a baseline examination, they do not need to participate in the BAP to receive a monetary award.  Any award to a retired player may be reduced by 10% if the retired player does not participate in the BAP, as explained in more detail in Question 20.

**12.  Why should a retired player get a BAP baseline examination?**

Getting a BAP baseline examination will be beneficial.  It will determine whether the retired player has any cognitive impairment.  If he is diagnosed with Level 1 Neurocognitive Impairment (*i.e.*, moderate cognitive impairment), he will be eligible to receive further medical testing and/or treatment for that condition.  In addition, regardless of any cognitive impairment today, the results of the BAP baseline examination can be used as a comparison to measure any subsequent deterioration of cognitive condition over the course of his life.  Participants also will be examined by at least two experts during the BAP baseline examinations, a neuropsychologist and a neurologist, and the retired player and/or his family members will have the opportunity to ask questions relating to any cognitive impairment during those examinations.

217

TEMPLATE

Participation in the BAP does not prevent the retired player from filing a claim for a monetary award. For the next 65 years, retired players will be eligible for compensation paid from the Monetary Award Fund if the player develops a Qualifying Diagnosis (see Question 14). Participation in the BAP also will help ensure that, to the extent the retired player receives a Qualifying Diagnosis in the future, he will receive the maximum monetary award to which he is entitled (see Question 20).

**13. How does a retired player schedule a baseline assessment examination and where will it be done?**

Retired players need to register for Settlement benefits before they can get a baseline assessment examination. Registration for benefits will not be available until after Final Settlement Approval. A retired player may provide his name and contact information now at **www.NFLConcussionSettlement.com** or by calling **1-800-000-0000**. This ensures that the retired player will receive additional notice about the registration process and deadlines when it becomes available.

The BAP Administrator will send notice to those retired players determined during registration to be eligible for the BAP, explaining how to arrange for an initial baseline assessment examination. The BAP will use a nationwide network of qualified and independent medical providers who will provide both the initial baseline assessment as well as any further testing and/or treatment. The BAP Administrator, which will be appointed by the Court, will establish the network of medical providers.

## MONETARY AWARDS

**14. What diagnoses qualify for monetary awards?**

Monetary awards are available for the diagnosis of ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (i.e., moderate Dementia), Level 1.5 Neurocognitive Impairment (i.e., early Dementia) or Death with CTE (the "Qualifying Diagnoses"). A Qualifying Diagnosis may occur at any time until the end of the 65-year term of the Monetary Award Fund.

If a retired player receives a monetary award based on a Qualifying Diagnosis, and later is diagnosed with a different Qualifying Diagnosis that entitles him to a larger monetary award than his previous award, he will be eligible for an increase in compensation. This would also apply to Derivative Claimants.

Qualifying Diagnoses must be made by approved qualified specialists. Any time prior to Final Settlement Approval, only board-certified neurologists, board-certified neurosurgeons or board-certified neuro-specialist physicians or similarly qualified specialists can make Qualifying Diagnoses. Following Final Settlement Approval, only qualified specialists approved by the Claims Administrator will be able to make Qualifying Diagnoses with the exception of Qualifying Diagnoses made through the BAP.

**15. Do I need to prove that playing football caused the Qualifying Diagnosis?**

No. No proof is necessary that a retired player's Qualifying Diagnosis was caused by playing football or that he experienced head injuries in the NFL, AFL, World League of American Football, NFL Europe League or NFL Europa League in order to receive a monetary award. The fact that a retired player receives a Qualifying Diagnosis is sufficient to be eligible for a monetary award.

QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM

Exhibit 5                                                                                                    Page 10

TEMPLATE

You also do not need to exclude the possibility that the Qualifying Diagnosis was caused or contributed to by amateur football or other professional football league injuries or by various risk factors linked to the Qualifying Diagnosis.

**16. How much money will I receive?**

The amount of money you will receive depends on the retired player's:
- Specific Qualifying Diagnosis,
- Age at the time of diagnosis (*see* Question 17),
- Number of seasons played or practiced in the NFL or the AFL (*see* Question 18),
- Diagnosis of a prior stroke or traumatic brain injury (*see* Question 19), and
- Participation in a baseline assessment exam (*see* Question 20).

The amount of money you will receive also depends on:
- Any legally enforceable liens on the award,
- Any retainer agreement with an attorney, and
- Any further assessments ordered by the Court (*see* Question 34).

Certain costs and expenses related to resolving any liens for Settlement Class Members will be paid out of such Settlement Class Members' monetary awards or derivative claimant awards.

The table below lists the maximum amount of money available for each Qualifying Diagnosis before any adjustments are made.

| QUALIFYING DIAGNOSIS | MAXIMUM AWARD AVAILABLE |
|---|---|
| Amyotrophic lateral sclerosis (ALS) | $5 million |
| Death with CTE (diagnosed after death) | $4 million |
| Parkinson's Disease | $3.5 million |
| Alzheimer's Disease | $3.5 million |
| Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia) | $3 million |
| Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) | $1.5 million |

Monetary awards may be increased up to 2.5% per year during the 65-year Monetary Award Fund term for inflation.

To receive the maximum amount outlined in the table, a retired player must have played for at least five Eligible Seasons (*see* Question 18) and have been diagnosed when younger than 45 years old.

Derivative Claimants are eligible to be compensated from the monetary award of the retired player with whom they have a close relationship in an amount of 1% of that award. If there are multiple Derivative Claimants for the same retired player, the 1% award will be divided among the Derivative Claimants according to the law where the retired player (or his Representative Claimant, if any) resides.

TEMPLATE

### 17. How does the age of the retired player at the time of first diagnosis affect a monetary award?

Awards are reduced for retired players who were 45 or older when diagnosed. The younger a retired player is at the time of diagnosis, the greater the award he will receive. Setting aside the other downward adjustments to monetary awards, the table below provides:

- The average award within each age range for people diagnosed between the ages of 45-79; and
- The amount of the award for those under age 45 and over 79.

The actual amount will be determined based on each retired player's actual age at the time of diagnosis and on other potential adjustments.

| AGE AT DIAGNOSIS | ALS | DEATH W/CTE | PARKINSON'S | ALZHEIMER'S | LEVEL 2 | LEVEL 1.5 |
|---|---|---|---|---|---|---|
| Under 45 | $5,000,000 | $4,000,000 | $3,500,000 | $3,500,000 | $3,000,000 | $1,500,000 |
| 45 - 49 | $4,500,000 | $3,200,000 | $2,470,000 | $2,300,000 | $1,900,000 | $950,000 |
| 50 - 54 | $4,000,000 | $2,300,000 | $1,900,000 | $1,600,000 | $1,200,000 | $600,000 |
| 55 - 59 | $3,500,000 | $1,400,000 | $1,300,000 | $1,150,000 | $950,000 | $475,000 |
| 60 - 64 | $3,000,000 | $1,200,000 | $1,000,000 | $950,000 | $580,000 | $290,000 |
| 65 - 69 | $2,500,000 | $980,000 | $760,000 | $620,000 | $380,000 | $190,000 |
| 70 - 74 | $1,750,000 | $600,000 | $475,000 | $380,000 | $210,000 | $105,000 |
| 75 - 79 | $1,000,000 | $160,000 | $145,000 | $130,000 | $80,000 | $40,000 |
| 80+ | $300,000 | $50,000 | $50,000 | $50,000 | $50,000 | $25,000 |

**Note:** The age of the retired player at diagnosis (not the age when applying for a monetary award) is used to determine the monetary amount awarded.

### 18. How does the number of seasons a retired player played affect a monetary award?

Awards are reduced for retired players who played less than five "Eligible Seasons." The Settlement uses the term "Eligible Season" to count the seasons in which a retired player played or practiced in the NFL or AFL. A retired player earns an Eligible Season for:

- Each season where he was on an NFL or AFL Member Club's "Active List" for either three or more regular season or postseason games, or

- Where he was on an Active List for one or more regular or postseason games and then spent two regular or postseason games on an injured reserve list or inactive list due to a concussion or head injury.

QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM

Exhibit 5                                                                 Page 12

TEMPLATE

- A retired player also earns one-half of an Eligible Season for each season where he was on an NFL or AFL Member Club's practice, developmental or taxi squad for at least eight games, but did not otherwise earn an Eligible Season.

The "Active List" means the list of all players physically present, eligible and under contract to play for an NFL or AFL Member Club on a particular game day within any applicable roster or squad limits in the applicable NFL or AFL Constitution and Bylaws.

Time spent playing or practicing in the World League of American Football, NFL Europe League and NFL Europa League does not count towards an Eligible Season.

The table below lists the reductions to a retired player's (or his Representative Claimant's) monetary award if the retired player has less than five Eligible Seasons. To determine the total number of Eligible Seasons credited to a retired player, add together all of the earned Eligible Seasons and half Eligible Seasons. For example, if a retired player earned two Eligible Seasons and three half Eligible Seasons, he will be credited with 3.5 Eligible Seasons.

| NUMBER OF ELIGIBLE SEASONS | PERCENTAGE OF REDUCTION |
|---|---|
| 4.5 | 10% |
| 4 | 20% |
| 3.5 | 30% |
| 3 | 40% |
| 2.5 | 50% |
| 2 | 60% |
| 1.5 | 70% |
| 1 | 80% |
| .5 | 90% |
| 0 | 97.5% |

**19. How do prior strokes or traumatic brain injuries of a retired player affect a monetary award?**

It depends. A retired player's monetary award (or his Representative Claimant monetary award) will be reduced by 75% if he experienced: (1) a medically diagnosed stroke that occurred before or after the time the retired player played NFL football, but before he received a Qualifying Diagnosis; or (2) a severe traumatic brain injury unrelated to NFL football that occurred during or after the time the retired player played NFL football, but before he received a Qualifying Diagnosis.

The award will not be reduced if the retired player (or his Representative Claimant) can show by clear and convincing evidence that the stroke or traumatic brain injury is not related to the Qualifying Diagnosis.

**20. How is a retired player's monetary award affected if he does not participate in the BAP Program?**

It depends on when the retired player receives his Qualifying Diagnosis and the nature of the diagnosis. There is a 10% reduction to the monetary award only if the retired player:

- Did not receive a Qualifying Diagnosis prior to July 7, 2014, and

QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM

Exhibit 5                                                                                    Page 13

TEMPLATE

- Does not participate in the BAP, and

- Receives a Qualifying Diagnosis (other than ALS) after his deadline to receive a BAP baseline assessment examination.

### 21. Can I receive a monetary award even though the retired player is dead?

Yes. Representative Claimants for deceased retired players with a Qualifying Diagnoses will be eligible to receive monetary awards. If the deceased retired player died before January 1, 2006, however, the Representative Claimant will only receive a monetary award if the Court determines that a wrongful death or survival claim is allowed under applicable state law.

Derivative Claimants also will be eligible for a total award of 1% of the monetary award that the Representative Claimant for the deceased retired player receives (*see* Question 16).

Representative and Derivative Claimants will also need to register for Settlement benefits (*see* Question 26).

### 22. Will this Settlement affect a retired player's participation in NFL or NFLPA-related benefits programs?

No. The Settlement benefits are completely independent of any benefits programs that have been created by or between the NFL and the NFL Players Association. This includes the 88 Plan (Article 58 of the 2011 Collective Bargaining Agreement) and the Neuro-Cognitive Disability Benefit (Article 65 of the 2011 Collective Bargaining Agreement).

**Note:** The Settlement ensures that a retired player who has signed, or will sign, a release as part of his Neuro-Cognitive Disability Benefit application, will not be denied Settlement benefits.

### 23. Will this Settlement prevent retired players from bringing workers' compensation claims?

No. Claims for workers' compensation will not be released by this Settlement.

## EDUCATION FUND

### 24. What type of education programs are supported by the Settlement?

The Settlement will provide $10 million in funding to support education programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of retired players regarding the NFL's medical and disability programs and other educational programs and initiatives.

Retired players will be able to actively participate in such initiatives if they desire.

QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM

Exhibit 5                                                                                          Page 14

TEMPLATE

# CHAPTER 3:  YOUR RIGHTS

## REMAINING IN THE SETTLEMENT

**25. What am I giving up to stay in the Settlement Class?**

Unless you exclude yourself (opt out) from the Settlement (*see* Question 30), you cannot sue the NFL Parties, the Member Clubs, or related individuals and entities, or be part of any other lawsuit against the NFL Parties about the issues in this case.  This means you give up your right to continue to litigate any claims related to this Settlement, or file new claims, in any court or in any proceeding at any time. **However, the Settlement does not release any claims for workers' compensation (*see* Question 23) or claims alleging entitlement to NFL medical and disability benefits available under the Collective Bargaining Agreement.**

Please note that certain Plaintiffs also sued the football helmet manufacturer Riddell and certain related entities (specifically, Riddell, Inc., Riddell Sports Group Inc., All American Sports Corporation, Easton-Bell Sports, Inc., EB Sports Corp., Easton-Bell Sports, LLC and RBG Holdings Corp.). **They are not parties to this Settlement and claims against them are not released by this Settlement.**

Article XVIII of the Settlement Agreement contains the complete text and details of what Settlement Class Members give up unless they exclude themselves (opt out) from the Settlement, so please read it carefully. The Settlement Agreement is available at www.NFLConcussionSettlement.com.   The Settlement Agreement is also on file with the Clerk of the Court for the Eastern District of Pennsylvania (*see* Question 35 for the address).   You can also get this information by calling **1-800-000-0000**.   If you have any questions you can talk to the law firms listed in Question 33 for free or you can talk to your own lawyer if you have questions about what this means.

## HOW TO GET BENEFITS

**26. How do I get Settlement benefits?**

To get benefits, you will need to register.  This is true for all Settlement Class Members, including Representative and Derivative Claimants.   Registration for benefits will not begin until after Final Settlement Approval (*see* Question 37).  If and when that occurs, further notice will be provided about the registration process and deadlines. **However, you may provide your name and contact information now at www.NFLConcussionSettlement.com or by calling 1-800-000-0000.  This ensures that you will receive additional notice about the registration process and deadlines when that becomes available.** To receive any Settlement benefits, you must register on or before 180 days from the date that further notice about the registration process and deadlines is posted on www.NFLConcussionSettlement.com. Information about the registration deadline will also be available by calling **1-800-000-0000**.

**27. Is there a time limit to file claims for monetary awards?**

Yes.  Retired NFL Football Players and Representative Claimants for retired players who are diagnosed by the date of Final Settlement Approval must submit claims for monetary awards within two years of the date that further notice about the registration process and deadlines is posted on www.NFLConcussionSettlement.com.  Retired NFL Football Players and Representative Claimants for

Exhibit 5                                                                                          Page 15

TEMPLATE

retired players who are diagnosed after the date of Final Settlement Approval have two years from the date of diagnosis to file claims. This deadline may be extended up to an additional two years upon a showing of substantial hardship.

Derivative Claimants must submit claims no later than 30 days after a Retired NFL Football Player or a Representative Claimant receives notice of an entitlement to a monetary award. All claims must be submitted by the end of the 65-year term of the Monetary Award Fund.

**28. Can I re-apply for compensation if my claim is denied?**

Yes. A Settlement Class Member who submits a claim for a monetary award that is denied can re-apply in the future should the Retired NFL Football Player's medical condition change.

**29. Can I appeal the determination of my monetary award claim?**

Yes. The Settlement establishes an independent process for a Settlement Class Member to appeal the denial of a monetary award claim or the amount of the monetary award.

## EXCLUDING YOURSELF (OPTING OUT) FROM THE SETTLEMENT

If you want to retain the right to sue the NFL Parties about the legal issues in this case, then you must take steps to remove yourself from the Settlement. You may do this by asking to be excluded from—opting out of—the Settlement Class. If you exclude yourself (opt out), you cannot receive benefits from this Settlement.

**30. How do I get out of the Settlement?**

On or before **October 14, 2014**, you must mail a letter or other written document to the Claims Administrator requesting exclusion from the Settlement Class. Your request must include:

- Your name, address, telephone number, and date of birth;

- A copy of your driver's license or other government issued identification;

- A statement that "I wish to exclude myself from the Settlement Class in *In re: National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323" (or substantially similar clear and unambiguous language); and

- Your signature by hand, and the date on which you signed it (even if represented by an attorney).

You must mail your exclusion (opt out) request, postmarked on or before **October 14, 2014**, to:
NFL Concussion Settlement
P.O. Box 0000
City, ST 00000

Your request to exclude yourself (opt out) is not effective unless and until the District Court grants Final Approval.

**QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM**

Exhibit 5                                                                                                 Page 16

224

TEMPLATE

**31. If I do not exclude myself (opt out), can I sue the NFL Parties for the same thing later?**

No. Unless you exclude yourself (opt out), you give up the right to sue the NFL Parties for all of the claims that this Settlement resolves. If you want to maintain your own lawsuit relating to the claims released by the Settlement, then you must exclude yourself (opt out) on or before **October 14, 2014.**

**32. If I exclude myself (opt out), can I still get benefits from this Settlement?**

No. **If you exclude yourself (opt out) from the Settlement you will not get any Settlement benefits.** You will not be eligible to receive a monetary award or participate in the Baseline Assessment Program.

## THE LAWYERS REPRESENTING YOU

**33. Do I have a lawyer in the case?**

The Court has appointed a number of lawyers to represent all Settlement Class Members as "Co-Lead Class Counsel," "Class Counsel" and "Subclass Counsel" (*see* Question 6). They are listed at the end of this Notice with their contact information.

You will not be charged for contacting these lawyers. If you are represented by an attorney, you may contact your attorney to discuss the proposed Settlement. You do not have to hire your own attorney. However, if you want to be represented by your own lawyer, you may hire one at your own expense.

**34. How will the lawyers be paid?**

At a later date to be determined by the Court, Co-Lead Class Counsel, Class Counsel and Subclass Counsel will ask the Court for an award of attorneys' fees and reasonable costs. The NFL Parties have agreed not to oppose or object to the request for attorneys' fees and reasonable incurred costs if the request does not exceed $112.5 million. These fees and incurred costs will be paid separately by the NFL Parties and not from the Baseline Assessment Program Fund, Education Fund or Monetary Award Fund. Settlement Class Members will have an opportunity to comment on and/or object to this request at an appropriate time. Ultimately, the award of attorneys' fees and reasonable costs to be paid by the NFL Parties is subject to the approval of the Court.

After Final Settlement Approval, Co-Lead Class Counsel may ask the Court to set aside up to five percent of each monetary award and derivative claimant award to facilitate the Settlement program and related efforts of Co-Lead Class Counsel, Class Counsel and Subclass Counsel. If approved, this money would be held in a separate fund overseen by the Court. Any future request for a set-aside will describe: (1) the proposed amount; (2) how the money will be used; and (3) any other relevant information. This "set-aside" would come out of the claimant's attorney's fee if represented by individual counsel or, if not represented, out of the monetary award and derivative claimant award itself. No money will be held back or set aside from any award without a Court order. The set-aside is a matter between Class Counsel and individual counsel for Settlement Class Members. The NFL Parties do not take a position on the proposal.

Case 2:12-md-02323-AB   Document 6084-1   Filed 07/07/14   Page 18 of 20

TEMPLATE

## OBJECTING TO THE SETTLEMENT

**35. How do I tell the Court if I do not like the Settlement?**

If you have not excluded yourself (opted out), you may object to the Settlement or any part of it. The Court will consider your views. To object to the Settlement, you or your attorney must submit your written objection to the Court. The objection must include the following:

- The name of the case and multidistrict litigation, *In re: National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323;

- Your name, address, telephone number, and date of birth;

- If you are a Representative Claimant or Derivative Claimant, the name of the Retired NFL Football Player to whom you are related;

- Written statement or evidence establishing how you are a Settlement Class Member;

- A detailed statement of your objections, and the specific reasons for each such objection, including any facts or law you wish to bring to the Court's attention;

- Any other supporting papers, materials or briefs that you want the Court to consider in support of your objection; and

- Your signature by hand, and the date on which you signed it (even if represented by an attorney).

Attorneys filing objections on behalf of Settlement Class Members must follow the requirements in Section 14.3(b) of the Settlement Agreement.

You must mail your objection, postmarked on or before **October 14, 2014**, to:

| COURT |
| --- |
| Clerk of the District Court/NFL Concussion Settlement |
| U.S. District Court for the Eastern District of Pennsylvania |
| United States Courthouse |
| 601 Market Street |
| Philadelphia, PA 19106-1797 |

**36. What is the difference between objecting to the Settlement and excluding myself (opting out)?**

Objecting is simply telling the Court that you do not like something about the Settlement or want it to say something different. You can object only if you do not exclude yourself (opt out) from the Settlement Class. Excluding yourself (opting out) is telling the Court that you do not want to be part of the Settlement Class and you do not want to receive any Settlement benefits. If you exclude yourself (opt out), you have no basis to object because the case no longer affects you.

QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM

Exhibit 5                                                                                     Page 18

# 226

TEMPLATE

## THE COURT'S FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the Settlement. You may attend and you may ask to speak, but you do not have to. The Court will determine if you are allowed to speak if you request to do so (*see* Question 39).

### 37. When and where will the Court hold a Fairness Hearing concerning the Settlement?

The Court will hold the Fairness Hearing on **Wednesday, November 19, 2014 at 10:00 a.m.** at the United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania 19106 in Courtroom 7B. The hearing may be moved to a different date or time without additional notice, so it is a good idea to check www.NFLConcussionSettlement.com or call **1-800-000-0000**. At this hearing, the Court will hear evidence about whether the Settlement is fair, reasonable, and adequate. If there are objections, the Court will consider them and may elect to listen to people who have asked to speak at the hearing. After the hearing, the Court will decide whether to approve the Settlement. We do not know how long the decision will take.

After the Fairness Hearing, the Court will consider the request for attorneys' fees and reasonable costs by Co-Lead Class Counsel, Class Counsel and Subclass Counsel (*see* Question 34).

### 38. Do I have to attend the hearing?

No. Co-Lead Class Counsel, Class Counsel and Subclass Counsel will answer questions the Court may have. But you are welcome to attend at your own expense. If you timely file an objection, you do not have to come to Court to talk about it. As long as you filed your written objection on time, the Court will consider it. You may also have your own lawyer attend at your expense, but it is not necessary.

### 39. May I speak at the hearing?

On or before **November 3, 2014**, you may ask the Court for permission to speak at the Fairness Hearing. The Court will determine whether to grant you permission to speak. To make such a request, you must send written notice to the Court stating your intention to speak at the *In re: National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323 Fairness Hearing. Be sure to include your name, address, telephone number, and your signature. Your request to speak must be sent to the Court at the address in Question 35.

## GETTING MORE INFORMATION

### 40. How do I get more information?

This Notice summarizes the proposed Settlement. More details are in the Settlement Agreement. You can get a copy of the Settlement Agreement at www.NFLConcussionSettlement.com. The Settlement Agreement is also on file with the Clerk of the Court for the Eastern District of Pennsylvania (*see* Question 35 for the address). You also may write with questions to NFL Concussion Settlement, **P.O. Box 0000, City, ST 00000** or call **1-800-000-0000. PLEASE DO NOT WRITE OR TELEPHONE THE COURT OR THE NFL PARTIES FOR INFORMATION ABOUT THE SETTLEMENT OR THIS LITIGATION.**

QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM

Exhibit 5                                                                                          Page 19

Case 2:12-md-02323-AB   Document 6084-1   Filed 07/07/14   Page 20 of 20

TEMPLATE

| IMPORTANT DATES & CONTACT INFORMATION | |
|---|---|
| Exclusion (Opt Out) Deadline | October 14, 2014 |
| Objection Deadline | October 14, 2014 |
| Deadline to Request to Speak at the Fairness Hearing | November 3, 2014 |
| Fairness Hearing | November 19, 2014 |
| Start of Registration Period | The date the announcement of the registration process is posted on the Settlement Website. (This will occur following Final Settlement Approval after all appeals.) |
| Registration Deadline | 180 days after the start of the registration period |
| Deadline to Receive a BAP | • For retired players age 43 or older: Within two years of Final Settlement Approval<br>• For retired players under age 43: Within ten years of Final Approval or before age 45, whichever comes sooner |
| Deadline to Submit a Claim | • For retired players (and their Representative Claimants) diagnosed by the date of Final Settlement Approval: Within two years from the start of the Registration Period<br>• For retired players (and their Representative Claimants) diagnosed after the date of Final Settlement Approval: Within two years from the date of diagnosis |
| Settlement Administrator | **NFL Concussion Settlement**<br>**P.O. Box 0000**<br>**City, ST 00000**<br>**Tel: 1-800-000-0000** |
| Court | Clerk of the District Court/NFL Concussion Settlement<br>U.S. District Court for the Eastern District of Pennsylvania<br>United States Courthouse<br>601 Market Street<br>Philadelphia, PA 19106-1797 |
| Class Counsel | Christopher A. Seeger<br>Co-Lead Class Counsel<br>SEEGER WEISS LLP<br>77 Water Street<br>New York, NY 10005 | Sol Weiss<br>Co-Lead Class Counsel<br>ANAPOL SCHWARTZ<br>1710 Spruce Street<br>Philadelphia, PA 19103 |
| | Steven C. Marks<br>Class Counsel<br>PODHURST ORSECK P.A.<br>City National Bank Building<br>25 W. Flagler Street, Suite 800<br>Miami, FL 33130-1780 | Gene Locks<br>Class Counsel<br>LOCKS LAW FIRM<br>The Curtis Center, Suite 720 East<br>601 Walnut Street<br>Philadelphia, PA 19106 |
| | Arnold Levin<br>Counsel - Subclass 1<br>LEVIN FISHBEIN SEDRAN & BERMAN<br>510 Walnut Street, Suite 500<br>Philadelphia, PA 19106 | Dianne M. Nast, Counsel –<br>Counsel - Subclass 2<br>NAST LAW LLC<br>1101 Market Street, Suite 2801<br>Philadelphia, Pennsylvania 19107 |

QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM

Exhibit 5                                                                                              Page 20

228

EXHIBIT 2

# NFL Concussion Settlement

## All Valid Claims of Retired NFL Football Players to be Paid in Full for 65 Years
## Monetary Awards, Baseline Medical Exams and Other Benefits Provided

The NFL and NFL Properties have agreed to a class action Settlement with retired players who sued, accusing them of failing to warn of and hiding the dangers of brain injury associated with playing football. The Settlement does not establish any wrongdoing on the part of the NFL or NFL Properties.

**Who is included in the Settlement?**

The Settlement Class generally includes all retired players of the NFL, AFL, World League of American Football, NFL Europe League and NFL Europa League. The Settlement Class includes immediate family members of retired players and legal representatives of incapacitated, incompetent or deceased players

**What does the Settlement provide?**

The Settlement provides money for three benefits:
- Baseline medical exams to determine if retired players suffer from neurocognitive impairment and are entitled to additional testing and/or treatment ($75 million),
- Monetary awards for diagnoses of ALS (Lou Gehrig's disease), Alzheimer's Disease, Parkinson's Disease, Dementia and certain cases of chronic traumatic encephalopathy or CTE (a neuropathological finding) diagnosed after death. The maximum monetary awards range from $1 5 million to $5 million depending on the diagnosis. All valid claims will be paid in full for 65 years; and
- Education programs and initiatives related to football safety ($10 million).

### How can I get benefits?

You will need to register for benefits after the final approval of the Settlement. You may provide your contact information now at the website or phone number below to ensure that you receive additional notice about the registration process.

Retired players do not have to prove that their injuries were caused by playing NFL football to get money from the Settlement.

### What are my rights?

You do not need to do anything to be included in the Settlement Class. All Settlement Class members will be bound by the Settlement and give up the right to sue the NFL individually. If you want to keep your right to sue the NFL, you must exclude yourself from the Class by **Month 00, 2014**. If you exclude yourself, you will not receive any benefits under the Settlement. If you stay in the Class, you may object to the Settlement by **Month 00, 2014**

The Court will hold a hearing on **Month 00, 2014** to consider whether to approve the Settlement. You do not have to attend. However, you and/ or your own lawyer may attend and request to speak at the hearing at your own expense. At a later date, the attorneys will ask the Court for an award of attorneys' fees and reasonable costs  The NFL and NFL Properties have agreed not to oppose or object to the request if the request does not exceed $112.5 million. The money would be paid by the NFL and NFL Properties in addition to the payments described above.

**Please Share this Notice with Other Retired Players and Their Families**
**For More Information on the Settlement and Registering for Benefits:**
**1-800-000-0000 or www.NFLConcussionSettlement.com**